## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| RAVEN ASSET MANAGEMENT, LLC, on behalf of itself and all others similarly situated,<br><br>　　　　　　　Plaintiff,<br><br>　　　v.<br><br>UNITED RENTALS, INC., WAYLAND R. HICKS, MARTIN E. WELCH, MICHAEL J. KNEELAND, BRIAN D. MCAULEY, GERALD TSAI, JR., MICHAEL S. GROSS, LEON D. BLACK, HOWARD L. CLARK, JR., SINGLETON MCALLISTER, JOHN S. MCKINNEY, JENNE K. BRITELL, KEITH WIMBUSH, ROGER E. SCHWED, JASON D. PAPASTAVROU,<br><br>　　　　　　　Defendants. | **JURY TRIAL DEMANDED**<br><br>Civil No. _____<br><br><br><br><br><br><br><br>December 17, 2007 |

### CLASS ACTION COMPLAINT

Plaintiff Raven Asset Management LLC ("Raven" or "Plaintiff"), by its undersigned counsel, brings this action on behalf of itself and all other similarly situated persons (the "Class"), other than defendants and their affiliates (as described herein), who purchased or otherwise acquired securities of United Rentals, Inc. ("URI"), between August 29, 2007 through and including November 14, 2007 (the "Class Period"), for violations of the federal securities laws. Plaintiff seeks to recover damages caused to the Class by defendants' violation of Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). The allegations of this Complaint are based on Plaintiff's personal knowledge as to itself and on information and belief (including the investigation of counsel and review of publicly available information) as to all other matters.

## SUMMARY OF THE ACTION

1.      Even in the high stakes world of private equity buyouts, the federal securities laws must not be ignored.  Yet ignoring the law is precisely what defendants did when they made numerous statements to the investing public throughout the Class Period regarding the material terms and anticipated closing of a merger transaction at a time when, known only to defendants and the other parties to the merger, the deal was falling apart.

2.      On July 23, 2007, defendant URI publicly announced that it had entered an Agreement and Plan of Merger among RAM Holdings, Inc. ("RAM Holdings"), RAM Acquisition Corp. ("RAM Acquisition") and United Rentals, Inc., dated as of July 22, 2007 (the "Merger Agreement").  RAM Holdings and RAM Acquisition are wholly-owned affiliates of Cerberus Capital Management, L.P. ("Cerberus," together with RAM Holdings and RAM Acquisition, the "Cerberus Entities").

3.      The Merger Agreement provided for URI shareholders to receive $34.50 in cash for each URI share, marking a 25% premium above the price of URI stock when the URI board of directors (the "URI Board" or the "URI Directors") first announced its intent to explore URI's strategic alternatives, including a possible sale of the Company.

4.      Besides the attractive financial terms of the $7 billion transaction, the Merger Agreement and defendants' disclosures relating to the Merger itself gave shareholders and the investing public at least two material reasons to be highly confident that the transaction would ultimately close.  First, unlike certain multi-billion dollar deals, in which the buyer's financing is not yet locked in upon announcement, the Cerberus Entities made their offer more attractive to the URI Board by obtaining fully committed

debt and equity financing, such that the ability to raise the funds needed to close the deal was not a condition to closing or contingency.

5.      Second, the Merger Agreement specifically provided both parties the right to seek specific performance of the deal in certain instances.   URI shareholders and the investing public were told, in the Merger Agreement and in other public disclosures, that as long as the contractually limited conditions to closing were met, URI would be able to compel the Cerberus Entities to close the deal rather than accept a termination fee.   This aspect of the deal was highly material to investors because in most recent private equity buyout deals, the buyer effectively purchased an option on whether to close the deal (even if all conditions were otherwise met) by limiting the remedies available to the selling corporation to a contractually defined termination fee.

6.      Unbeknownst to the URI's shareholders and member of the Class, by the end of August 2007, however, the Cerberus Entities had determined to seek to renegotiate the deal in order to obtain better terms for themselves (and worse terms for URI shareholders).   On August 31, 2007, RAM Holdings sent a letter to URI confirming a prior informal effort to initiate discussions to renegotiate the deal.   In response, on September 6, 2007, URI wrote directly to Cerberus, refusing to renegotiate and rejecting the purported bases for putting the Merger in question.   Cerberus did not accept or concede URI's position.   The investing public remained blinded to the brewing standoff between the parties, and the Cerberus Entities' efforts to renegotiate the deal.

7.      On September 19, 2007, URI and the URI Directors disseminated to the investing public a final proxy statement on Form 14A (the "Proxy Statement"), in which they purported to detail the circumstances surrounding and terms of the Merger.   A

lengthy section of the Proxy Statement, entitled "Background of the Merger," purported to provide an exhaustive recitation of the events leading to and following the public disclosure of the Merger Agreement. This chronology (which included a wide range of minutiae about how the deal came about and the parties' efforts to bring it to a consummation) omitted any reference to the parties' most recent exchange of letters and the dispute that cut to the heart of the completion of the transaction. Defendants' failure to disclose these facts rendered the information that was disclosed in this section of the Proxy Statement materially false and misleading.

8.      In addition, another section of the Proxy Statement, entitled "The Merger Agreement," gives a lengthy description of the agreement itself, which was also attached to the Proxy Statement. In a subsection entitled "Specific Performance," defendants highlighted URI's contractual right to compel closing of the deal, provided all other conditions were met, even if the Cerberus Entities changed their views of the deal's merits from the buyers' perspective. This conflicted materially from the views expressed in the parties' exchange of letters and continuing dispute regarding renegotiation and the availability of specific performance. Nevertheless, this section of the Proxy Statement omitted any reference to the parties' most recent exchange of letters and the dispute that threatened the completion of the deal. Defendants' failure to disclose these facts rendered the information disclosed in this section of the Proxy Statement materially false and misleading.

9.      Through the remainder of the Class Period, Defendants made numerous other public statements, including repeated references to an anticipated closing by November 16, 2007, that were false and misleading in light of the absence of any

4

reference to or disclosure of the parties' pending dispute as to whether the deal could and would close on the terms previously disclosed to investors.

10.     On November 14, 2007, RAM Holdings delivered a letter formally refusing to close the deal as negotiated, but again inviting URI to renegotiate its terms. Having seen their attempt to call the Cerberus Entities' bluff backfire, defendants were forced to belatedly disclose the more than two-month old dispute, attaching the August 31 and September 6 letters to a Form 8-K filed with the SEC.  In response, URI's stock price plummeted over 30%, from $34.37 at the open on November 14, 2007 to a close of $23.50 (with an intraday low of $21.91) on massive volume of over 36 million shares (more than ten times the average volume of the prior months).  This decline represented a loss in market capitalization of nearly one billion dollars.

11.     This action seeks relief for Plaintiff and other Class members who acquired URI securities based on the publicly disclosed merger terms and the high expectation that the Merger would close but suffered losses when the truth came out regarding the real risk to the deal.

## PARTIES

12.     Plaintiff Raven Asset Management LLC ("Raven") is an SEC registered investment advisor headquartered in Maplewood, New Jersey.  Raven has sole discretion and authority to manage investments and bring litigation on behalf of its clients.  Raven purchased URI shares during the Class Period and suffered losses as a result of the misstatements and omissions alleged herein.

13.     Defendant United Rentals, Inc. ("URI") is a Delaware corporation with its principal executive offices located at Five Greenwich Office Park, Third Floor, Greenwich, Connecticut 06830.  URI is the largest equipment rental company in the

world, with an integrated network of over 690 rental locations in 48 states, 10 Canadian provinces and Mexico. URI is a member of the Standard & Poor's MidCap 400 Index and the Russell 2000 Index.

14.     Defendant Wayland R. Hicks ("Hicks") served as Chief Executive Officer ("CEO") of URI from December 2003 until June 4, 2007, and is currently a director of the Company and Vice Chairman of the Board of Directors.

15.     Defendant Martin E. Welch ("Welch") is, and has been since September 2005, the Executive Vice President and Chief Financial Officer ("CFO") of URI.

16.     Defendant Michael J. Kneeland ("Kneeland") is, and has been since March 2007, the Executive Vice President and Chief Operating Officer ("COO") of URI. Kneeland is, and has been the Company's interim Chief Executive Officer since June 2007.

17.     Defendant Roger E. Schwed ("Schwed") is, and has been since June 2006, Executive Vice President and General Counsel of the Company.

18.     Defendant Brian D. McAuley ("McAuley") is, and has been a director of URI since April 2004.

19.     Defendant Gerald Tsai, Jr. ("Tsai") is, and has been, a director of URI since 2002.

20.     Defendant Michael S. Gross ("Gross") is, and has been, a director of URI since 1999.

21.     Defendant Leon D. Black ("Black") is, and has been, a director of URI since 1999.

6

22.     Defendant Howard L. Clark, Jr. ("Clark") is, and has been, a director of URI since April 2004.

23.     Defendant Singleton McAllister ("McAllister") is, and has been, a director of URI since April 2004.

24.     Defendant John S. McKinney ("McKinney") is, and has been, a director of URI since September 1998 and served as vice president of URI until the end of 2000.

25.     Defendant Jenne K. Britell ("Britell") is, and has been, a director of URI since December 14, 2006.

26.     Defendant Keith Wimbush ("Wimbush") is, and has been, a director of URI since April 11, 2006.

27.     Defendant Jason D. Papastavrou ("Papastavrou") is, and has been, a director of the Company since June 2005.

28.     The defendants named above in paragraphs 14 and 18-27 are referred to herein as the "URI Board" or "URI Directors."

29.     The executive officers named in paragraphs 15-17 above, together with URI and the URI Directors, are collectively referred to herein as "Defendants," and, with the URI Directors but not URI itself, the "Individual Defendants."

## PERTINENT NON-PARTIES

30.     Non-party Cerberus Capital Management, L.P. ("Cerberus") is a private equity firm with its principal offices located at 299 Park Avenue, New York, New York 10171.

31.     Non-party RAM Holdings, Inc. ("RAM Holdings") is a Delaware corporation with its principal executive offices located at 299 Park Avenue, New York,

New York 10171.  RAM Holdings is controlled by funds and accounts affiliated with Cerberus.

32.     Non-party RAM Acquisition Corp. ("RAM Acquisition") is a Delaware corporation with its principal executive offices located at 299 Park Avenue, New York, New York 10171.  RAM Acquisition is a wholly-owned subsidiary of RAM Holdings.

33.     Defendants Cerberus, RAM Holdings and RAM Acquisition are referred to collectively herein as the "Cerberus Entities."

## FACTUAL ALLEGATIONS

**A.     DEFENDANTS PUBLICLY ANNOUNCE THE MERGER AND MERGER AGREEMENT**

34.     On July 23, 2007, Defendants first publicly disclosed that Cerberus, through two acquisition vehicles, RAM Holdings, and RAM Acquisition, had agreed to acquire URI in a merger that would provide URI shareholders $34.50 in cash, a 25% premium to the Company's stock price before the URI Board announced its intention to entertain acquisition proposals.  URI's July 23, 2007 press release stated as follows:

> GREENWICH, Conn. – July 23, 2007 – United Rentals, Inc. (NYSE: URI) today announced that it has signed a definitive merger agreement to be acquired by affiliates of Cerberus Capital Management, L.P. ("Cerberus"), in a transaction valued at approximately $6.6 billion, including the assumption of approximately $2.6 billion in debt obligations.
>
> Under the terms of the agreement, United Rentals stockholders will receive $34.50 in cash for each share of United Rentals common stock that they hold. The purchase price per share represents a 25% premium over United Rentals' closing share price of $27.55 prior to the company's announcement on April 10, 2007 that it had commenced a process to explore a broad range of strategic alternatives.
>
> Bradley S. Jacobs, chairman of United Rentals, said, "We're pleased that our strategic alternatives process has resulted in this favorable agreement for our shareholders. This transaction is a credit to the thousands of United Rentals employees who have created unmatched value in our industry. A decade ago we started United Rentals with little more than a concept and

achieved industry leadership in just 13 months. Today we remain the preeminent equipment rental company in the world."

*****

The board of directors of United Rentals has approved the merger agreement and has recommended the approval of the transaction by United Rentals stockholders.

Completion of the transaction is subject to customary closing conditions, including approval of the transaction by United Rentals' stockholders and regulatory review.

35.     URI's Form 8-K filed with the SEC on July 24, 2007 (the "July 24 Form 8-K"), to which the press release was attached, provided a further description of the "closing conditions" noted in the press release, as follows:

> Parent has obtained debt and equity financing commitments for the transactions contemplated by the Merger Agreement, the aggregate proceeds of which will be sufficient for Parent to pay the aggregate merger consideration and all related fees and expenses, including any required refinancings or repayments of existing indebtedness. ***The Closing is not subject to a financing condition***, but it is subject to customary closing conditions, including (i) the approval of the Merger Agreement by the Company's stockholders, (ii) the absence of certain legal impediments to the consummation of the Merger and (iii) the expiration or termination of any required waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and applicable foreign antitrust laws.

(emphasis added)

36.     Notably, the July 24 Form 8-K informed investors of certain conditions, but did not state or suggest that Cerberus could unilaterally choose to walk away from the deal without any cause or reason, and pay only a $100,000,000 termination fee. The Form 8-K referred investors to the full text of the Merger Agreement, which was attached.

37.     The Merger Agreement refers to RAM Holdings, Inc. as "Parent" and RAM Acquisition Corp. as "Merger Sub."

38.     In addition to informing URI's current and potential investors about the financial terms of the deal, including the $34.50 merger price, the Merger Agreement provided additional information and commitments of each party that were highly material. Of particular import to investors, the Merger Agreement provided that if all closing conditions (*i.e.*, URI shareholder approval, the absence of judicial or regulatory blockage of the deal and no breaches of the agreement) were met, either party had a right to seek specific performance of the other party.

39.     Section 8.1 of the Merger Agreement sets forth the conditions under which either party could ***terminate*** the Merger, and none of those sub-paragraphs allow the Cerberus Entities unilaterally to determine that it was no longer interested in closing even if all closing conditions had otherwise been met.

40.     Section 8.2 of the Merger Agreement, entitled "Effect of Termination," sets forth the consequences of a ***termination***, including the payment of various termination fees "[i]n the event of the termination of this Agreement ***pursuant to Section 8.1....*" (emphasis added). Because Section 8.1 does not provide the Cerberus Entities the unilateral decision to refuse to close despite all closing conditions being met, URI shareholders and the investing public believed that the termination fee was not the express and only remedy for such a decision by Cerberus.

41.     The ability to seek specific performance in the event of a unilateral and not-otherwise excused refusal by a counterparty to close on the transaction is expressly provided in Section 9.10, which provides:

> SECTION 9.10.  Specific Performance.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, (a) Parent and Merger Sub shall

be entitled to seek an injunction or injunctions ... and (b) *the Company shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement by Parent or Merger Sub or to enforce specifically the terms and provisions of this Agreement* and the Guarantee to prevent breaches of or enforce compliance with those covenants of Parent or Merger Sub that require Parent or Merger Sub to (i) use its reasonable best efforts to obtain the Financing and satisfy the conditions to closing set forth in Section 7.1 and Section 7.3, including the covenants set forth in Section 6.8 and Section 6.10 and (ii) *consummate the transactions contemplated by this Agreement, if in the case of this clause (ii), the Financing (or Alternative Financing obtained in accordance with Section 6.10(b)) is available to be drawn down by Parent pursuant to the terms of the applicable agreements but is not so drawn down solely as a result of Parent or Merger Sub refusing to do so in breach of this Agreement....*

(emphases added)

42.     Investors recognized this contractual provision as a critical term of the Merger Agreement.   Coupled with the absence of any debt or equity financing contingencies to the deal (as discussed below), the specific performance provision significantly and materially eliminated the risk of non-consummation of the deal if shareholder and regulatory approval would be obtained.

43.     The Merger Agreement also made clear that the Cerberus Entities would play a direct role in disseminating the Proxy Statement and soliciting shareholder approval of the Merger.  Section 6.2 of the Merger Agreement states:

SECTION 6.2.  Proxy Statement.  As soon as reasonably practicable following the date of this Agreement, the Company shall, with the assistance of Parent, prepare and file with the SEC the Proxy Statement. Parent, Merger Sub and the Company will cooperate with each other in the preparation of the Proxy Statement.  Without limiting the generality of the foregoing, each of Parent and Merger Sub will furnish to the Company the information relating to it required by the Exchange Act and the rules and regulations promulgated thereunder to be set forth in the Proxy Statement. The Company shall not file the preliminary Proxy Statement, or any amendment or supplement thereto, without providing Parent a reasonable opportunity to review and comment thereon (which comments shall be reasonably considered by the Company)....  Each of Parent, Merger Sub

and the Company agree to correct any information provided by it for use in the Proxy Statement which shall have become false or misleading.

(emphases added.)

44.    In addition, Section 4.5 of the Merger Agreement states:

SECTION 4.5. Proxy Statement.  None of the information supplied or to be supplied by Parent or Merger Sub for inclusion or incorporation by reference in the Proxy Statement will, *at the date it is first mailed to the stockholders of the Company and at the time of the Stockholders Meeting*, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they are made, not misleading....

(emphasis added)

45.    The Merger Agreement also clearly set forth that the Cerberus Entities had already obtained fully committed debt financing and a binding commitment to provide equity financing, so that the availability of credit or financial ability to close would not serve to create a realistic risk of non-consummation of the Merger.  Section 4.7 states:

SECTION 4.7. Financing.  Parent has delivered to the Company true and complete copies of (i) the commitment letter, dated as of July 22, 2007, between Parent and Bank of America, N.A., Banc of America Bridge LLC, Banc of America Securities LLC, Credit Suisse, Credit Suisse Securities (USA) LLC, Morgan Stanley Senior Funding, Inc., Lehman Brothers Inc., Lehman Brothers Commercial Bank and Lehman Brothers Commercial Paper Inc. (the "Debt Financing Commitments"), pursuant to which Bank of America, N.A., Banc of America Bridge LLC, Credit Suisse, Morgan Stanley Senior Funding, Inc., Lehman Brothers Commercial Bank and Lehman Brothers Commercial Paper Inc. have agreed to lend the amounts (which may include up to $4,000,000,000 in bridge financing (the "Bridge Financing") to be utilized in the event the placement of high yield securities in a comparable amount (the "High Yield Financing") is not consummated) set forth therein (the "Debt Financing") *for the purpose of funding the transactions contemplated by this Agreement*, and (ii) the equity commitment letter, dated as of July 22, 2007, between Parent and Cerberus Capital Management, L.P. (the "Equity Financing Commitments" and together with the Debt Financing Commitments, the "Financing Commitments"), *pursuant to which Cerberus Capital Management, L.P. has committed to invest the amount set forth therein* (the "Equity Financing" and together with the Debt

12

Financing, the "Financing").... *The Financing Commitments are in full force and effect and constitute the legal, valid and binding obligations of each of Parent, Merger Sub and the other parties thereto.*

(emphases added.)

46.    In other words, both the debt and equity components of the deal were already committed, so (when coupled with the specific performance provision) the desire or willingness of the Cerberus Entities or its bank lenders to support the transaction was no longer a contingency for URI investors.

**B.    CERBERUS SEEKS TO RENEGOTIATE THE MERGER AND USE THE URI DEFENDANTS' FEDERAL DISCLOSURE OBLIGATIONS TO GAIN LEVERAGE**

47.    Instead of proceeding with the Merger Agreement in accordance with its publicly disclosed terms, on August 29, 2007, Cerberus representatives contacted investment banking representatives of URI in order to open discussions that would lead to a restructuring and renegotiation of the deal, if not its outright cancellation. When URI did not accept this invitation to renegotiate, Cerberus chose to escalate the pressure on URI by sending a formal letter, from RAM Holdings' President Steven Mayer to URI General Counsel Roger Schwed, in which Cerberus threatened to renege on the Merger Agreement (the "August 31 Letter"). The relevant portions of the letter are quoted below:

> As you know, on August 29, 2007, we communicated to UBS Investment Bank *our desire to have a conversation with United Rentals, Inc. ("URI") about the terms of the Agreement and Plan of Merger, dated as of July 22, 2007, among URI, Ram Holdings, Inc. and Ram Acquisition Corp. (the "Merger Agreement")*. We are troubled by URI's refusal to discuss the Merger Agreement with us.
>
> *Our request for a discussion was prompted by our concerns about recent unanticipated developments in the credit and financial markets.* We fully understand the terms and conditions of the Merger Agreement, Guarantee and Stockholders Agreements (each as defined in the Merger Agreement) and related agreements. *We believe it is in all of the parties' best interests*

> *to discuss the impact of these unanticipated market developments sooner rather than later. We would have expected that URI's Board of Directors would prefer to address these concerns now through a constructive dialogue.*
>
> *We are also troubled by URI's actions surrounding the filing of the Proxy Statement (as defined in the Merger Agreement). We raised a number of comments on the last draft we received, but URI chose to file the Proxy Statement without addressing our substantive comments or even discussing them with our counsel.*
>
> In light of the foregoing concerns, we are renewing our request to discuss the terms of the Merger Agreement. We will look forward to your response.

(emphases added).

48.    Delivering this written letter, which was copied to the corporate attorneys who negotiated the deal in the first instance, was rightfully understood by all parties to be a serious threat by Cerberus to renege on its obligations under the Merger Agreement if its demand for renegotiation were not met.  Also, Cerberus sought to gain leverage over URI because, once the material terms of the letter would be disclosed to the investing public as required by federal disclosure law, the URI Directors would likely face pressure from holders of URI stock to accept renegotiated terms rather than abandon the deal altogether.

49.    Rather than comply with federal disclosure law and disclose the material terms of the August 31 Letter that seriously threatened the completion of the deal, Defendants primarily responded in writing to Cerberus and failed to inform the investing public of the dispute.  This strategy would likely force Cerberus to either escalate the dispute (by going public itself) or to back away from its demands.  If the Cerberus Entities chose to close the deal despite their threats to the contrary, the investing public

14

would likely never learn about or suffer losses from the non-disclosed dispute and attendant risk to the deal.

50.    URI's written response, dated September 6, 2007 and addressed from Defendant Wimbush to Stephen Feinberg, Cerberus' founder and CEO (the "September 6 Response"), states:

Dear Steve:

We have not met, but with Brad Jacobs stepping down from United Rentals, Inc.'s board I wanted to introduce myself. The board has asked me to oversee the completion of our transaction with Cerberus. In that connection, I wanted to address with you the recent calls and letter that we received from Cerberus's acquisition vehicle, RAM Holdings, Inc., asking for a discussion with URI about the terms of the merger agreement.

As our advisors previously communicated to your colleagues, Steven Mayer and Mike Green, *there is no basis for any discussion regarding changes to the merger agreement*. The sole basis cited in the letter is your organization's "concerns about recent unanticipated developments in the credit and financial markets." *We fail to see how these developments have any relevance to our negotiated transaction, as their impact is expressly carved out of the merger agreement*. Section 3.1 of the merger agreement, for example, is clear that "facts, circumstances, events, changes, effects or occurrences ... generally affecting the economy or the financial, debt, credit or securities markets in the United States..." do not excuse RAM's performance under our agreed-upon transaction. Moreover, RAM has committed debt financing which by its terms is not conditioned on the developments referenced in your team's letter.

*****

*Simply put, we are sorely disappointed that your organization is now looking to renegotiate our deal without cause or contractual support*. Steve and Mike repeatedly represented at the time of our negotiations that Cerberus prided itself on not renegotiating its deals and should be viewed as being in the same league as other top-tier private equity firms. *RAM's seeking any modifications to the merger agreement is wholly inconsistent not only with these representations but also with the good faith discharge of its contractual obligation to use its reasonable best efforts to consummate the merger.*

*****

15

> I hope we can dispense with further communications of this type…. We should continue to focus the energy of the group on transition cooperation, working together to finalize the materials RAM will need to complete its financing on the best possible terms, and bringing this transaction to a successful closing under the existing contractual terms.

(emphases added).

## C.   URI AND THE URI BOARD CONTINUE TO MISLEAD THE PUBLIC REGARDING CERBERUS' EFFECTIVE REPUDIATION OF THE MERGER AGREEMENT

51.   Unlike secret merger negotiations that predate the public announcement of a deal (which in some instances may be withheld from public disclosure), the exchange of letters among Cerberus and URI was a highly material event and constituted a changed circumstance regarding the Merger itself, which had long ago been disclosed to the investing public and whose economic significance was already incorporated into URI's stock market prices. The August 31 Letter from Cerberus and the September 6 Response from URI  contained material information concerning the state of the deal and both required disclosure to the investing public.

52.   More importantly, in contrast with prior disclosures regarding the parties' mutual intent to close the transaction and regarding the availability of specific performance as a remedy for URI, the August 31 Letter and September 6 Response evidenced changed facts that rendered those prior disclosures misleading to the investing public. Among other things, the Cerberus Entities' position indicated that they did not share URI's view of the availability of specific performance.

53.   As set forth below, however, Defendants not only chose to withhold this highly material information right away, but they made other public statements, including the issuance of the final Proxy Statement on September 19, 2007 and other public

statements in support of the Merger Agreement's continued vitality, that left URI shareholders and the investing public materially uninformed.

54.     At the same time Cerberus representatives were contacting URI representatives on August 29 in order to renegotiate the deal, Defendants were also preparing to submit a preliminary proxy statement to the SEC for final approval and to the investing public.  On August 30, 2007, URI filed its preliminary proxy statement on Form 14A, which purported to describe the material Merger terms to investors, as well as the events leading to the deal and any material subsequent events.

55.     The August 30 preliminary proxy statement expressly states, in a section with the bold-face caption "Specific Performance," as follows:

**Specific Performance**

Parent, Merger Sub and the Company have agreed that irreparable damage would occur in the event that any of the provisions of the merger agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, the parties have agreed that they shall be entitled to seek an injunction to prevent breaches of the merger agreement and to be able to enforce specifically the terms and provisions of the merger agreement, in addition to any other remedy to which such party is entitled at law or in equity, including the covenants of Parent or Merger Sub that require Parent or Merger Sub to (i) use its reasonable best efforts to obtain the financing and satisfy certain conditions to closing, and (ii) consummate the transactions contemplated by the merger agreement, if the financing (or alternative financing) is available to be drawn down by Parent pursuant to the terms of the applicable agreements but is not so drawn down solely as a result of Parent or Merger Sub refusing to do so in breach of this Agreement. The provisions relating to specific performance are subject to the rights and obligations of the parties relating to receipt of payment of the termination fee, as described above under "Fees and Expenses," under the circumstances described therein.

56.     In filings with the Delaware Chancery Court, URI has asserted that "The Proxy Statement's discussion of specific performance and termination was included after review by, and no objection from, RAM."

57.    The preliminary proxy was first disseminated to the investing public on August 30, 2007. Critically, even after RAM Holdings delivered the August 31 Letter to URI and URI responded directly to Cerberus on September 6, the exact same disclosure regarding specific performance was placed in the final Proxy Statement, which was declared effective and mailed to URI shareholders and disseminated to the investing public on or about September 19, 2007. Investors had no way to know that the parties were actually disputing whether the agreement had to be closed on the terms as previously announced or that Cerberus was formally trying to renegotiate the deal.

58.    Even before the final Proxy Statement was filed, on September 13, 2007, URI issued a press release setting the special shareholders' meeting to vote upon the Merger for October 19, 2007. In addition, URI's September 13 press release updated shareholders as to the status of the Merger, stating: "Completion of the merger is subject to the adoption of the merger agreement by the Company's stockholders at the special meeting and the satisfaction of the other closing conditions set forth in the merger agreement. *The Company currently expects to complete the proposed merger during the fourth quarter*." Investors had no way to know that the parties were actually disputing whether the agreement had to be closed on the terms as previously announced.

59.    The Proxy Statement contained numerous other statements that, in light of the undisclosed August 31 Letter and September 6 Response, were materially false and misleading. Under the heading "Background of the Merger," the Proxy Statement provided ten full pages of disclosures regarding the events leading to the Merger Agreement and pertinent events following its public announcement on July 23, 2007. Despite the extensive detail provided on a wide range of negotiation and merger related

subjects, the Proxy Statement was completely silent as to the late August efforts of Cerberus to renegotiate the deal.

60.     The final Proxy Statement provides an update as to the satisfaction of the regulatory approval condition. Besides Canadian regulators' approval, which had been granted and disclosed in the preliminary proxy statement, the final Proxy Statement adds: "On August 7, 2007, the Company and RAM Holdings Company, LLC (parent company of RAM Holdings, Inc.) each filed a Notification and Report Form with the Antitrust Division and the Federal Trade Commission and requested early termination of the waiting period. The Federal Trade Commission notified the parties on August 31, 2007 that their request for early termination of the applicable waiting period had been granted."

61.     The regulatory approval condition set forth in the Merger Agreement was fully satisfied. Investors therefore gained a higher level of confidence that the deal would close. This level of confidence was misplaced because Defendants did not disclose the existence or import of the August 31 Letter and September 6 Response.

62.     On October 16, 2007, URI issued a press release announcing that a wholly owned subsidiary had, consistent with the terms of the Merger Agreement, commenced a tender offer for all of its outstanding 6 ½% Senior Notes due 2012, 7 ¾% Senior Subordinated Notes due 2013 and 7% Senior Subordinated Notes due 2014 (collectively, the URI Notes"). The October 16 press release and the various SEC documentation relating to the tender offer for the URI Notes discussed the expected closing of the Merger but again remained silent regarding the August 31 Letter and September 6 Response.

63.     At a special shareholders' meeting on October 19, 2007, an astounding 99.8% of URI's shareholders present at the meeting in person or by proxy voted in favor of consummation of the Merger Agreement, thus eliminating the remaining material condition to Cerberus' obligation to close the deal.  With the approval of the deal by URI shareholders, investors gained a higher level of confidence that the deal would close. This level of confidence was misplaced because Defendants did not disclose the existence or import of the August 31 Letter and September 6 Response.

64.     On October 31, 2007, URI issued an earnings release, and, on the accompanying Form 8-K (the "October 31 Form 8-K"), Defendants stated that "the Company currently anticipates completing its merger with an entity indirectly controlled by affiliates of Cerberus Capital Management, L.P. on or about November 16, 2007." Once again, Defendants did not disclose the existence or import of the August 31 Letter and September 6 Response, and the serious risk that the transaction would not close.

65.     The next day, on November 1, 2007, URI filed with the SEC the Company's Form 10-Q for the third quarter of 2007.  Once again, Defendants did not disclose the existence or import of the August 31 Letter and September 6 Response.

**D.     INVESTORS SUFFER MASSIVE IMMEDIATE LOSSES WHEN THE TRUTH ABOUT CERBERUS' RENEGING ON THE MERGER AGREEMENT IS REVEALED ON NOVEMBER 14, 2007**

66.     On November 14, 2007, the investing community was shocked to learn, first through media leaks and later in disclosure from URI and the URI Board, that the Cerberus Entities were seeking to renegotiate the transaction for better terms and would otherwise refuse to close the deal.

67.     Specifically, on November 14, 2007, URI issued a press release, attached to a Form 8-K (the "November 14 Form 8-K"), that stated, in pertinent part, as follows:

Greenwich, CT. — November 14, 2007 — United Rentals, Inc. (NYSE: URI) announced today that Cerberus Capital Management, L.P. informed it that Cerberus is not prepared to proceed with the purchase of United Rentals on the terms set forth in its merger agreement, dated July 22, 2007. Under that agreement, Cerberus agreed to acquire United Rentals for $34.50 per share in cash, in a transaction valued at approximately $7.0 billion.

The Company noted that Cerberus has specifically confirmed that there has not been a material adverse change at United Rentals.

United Rentals views this repudiation by Cerberus as unwarranted and incompatible with the covenants of the merger agreement. Having fulfilled all the closing conditions under the merger agreement, United Rentals is prepared to complete the transaction promptly.

The Company also pointed out that Cerberus has received binding commitment letters from its banks to provide financing for the transaction through required bridge facilities. The Company currently believes that Cerberus' banks stand ready to fulfill their contractual obligations.

United Rentals also said that its business continues to perform well, as evidenced by its strong third quarter results, which included record EBITDA. In addition, the Company believes that the revised strategic plan it began initiating at the beginning of the third quarter, which includes a refocus on its core rental business, improved fleet management and significant cost reductions, is providing the foundation to maintain its performance.

68.    The November 14 Form 8-K attached a letter of the same date, from RAM Holdings to URI's General Counsel, Roger Schwed.   In pertinent part, the RAM Holdings letter stated:

Dear Mr. Schwed:

We are writing in connection with the above-captioned Agreement. As you know, as part of the negotiations of the Agreement and the ancillary documentation, the parties agreed that our maximum liability in the event that we elected not to consummate the transaction would be payment of the Parent Termination Fee (as defined in the Agreement) in the amount of $100 million. This aspect of the transaction is memorialized in, among other places, Section 8.2(e) of the Agreement ....

In light of the foregoing, and after giving the matter careful consideration, this is to advise that Parent and Merger Sub are not prepared to proceed with the acquisition of URI *on the terms contemplated by the Agreement*.

[W]e see two paths forward. If URI is interested in exploring a transaction between our companies *on revised terms*, *we would be happy to engage in a constructive dialogue with you and representatives of your choosing at your earliest convenience*. We could be available to meet in person or telephonically with URI and its representatives for this purpose immediately. In order to pursue this path, we would need to reach resolution on revised terms within a matter of days.

If, however, you are not interested in pursuing such discussions, we are prepared to make arrangements, subject to appropriate documentation, for the payment of the $100 million Parent Termination Fee.

We look forward to your response.

(emphases added).

69.     The November 14, 2007 Form 8-K also attached, thereby disclosing to the investing public for the first time, the August 31 Letter and September 6 Response that started the dispute leading to the November 14 repudiation of the Merger Agreement.

70.     As a direct result of the shocking news about the Cerberus Entities' decision to refuse to close the Merger unless URI renegotiated the terms, URI's stock price plummeted by over 30%, from $34.37 at the open on November 14, 2007 to a close of $23.50 (with an intraday low of $21.91) on massive volume of over 36 million shares (more than ten times the average volume of the prior months.

71.     Defendants' failure to timely disclose the August 29 call seeking to renegotiate the Merger Agreement, the August 31 Letter or the September 6 Response was materially false and misleading and caused the price of URI stock to trade at artificially inflated levels, owing to the investing public's perceived high expectation that the deal would go through, which belief was inconsistent with the truth, namely that URI

22

and the Cerberus Entities were locked in a serious dispute about whether the deal would close in accordance with the terms of the Merger Agreement, or at all.

## RELIANCE: APPLICABILITY OF FRAUD ON THE MARKET PRESUMPTION

72.     At all relevant times, the market for URI's common stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.  Through the Class Period:

(a)     URI's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, URI filed periodic public reports with the SEC and the NYSE;

(c)     URI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Securities analysts and the business press followed and published research reports regarding URI that were publicly available to investors;

(e)     The market price of URI securities reacted promptly to the dissemination of public information regarding the Company;

(f)     The average weekly trading volume for URI stock during the Class Period was approximately 7.75 million; and

(g)    The Company's market capitalization was approximately $2.69 billion on July 24, 2007 (when the July 24 Form 8-K was filed), and $2.02 billion on November 14, 2007 (when the November 14 Form 8-K was filed).

73.    As a result of the misconduct alleged herein (including Defendants' misstatements and omissions), the market for URI securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies.

74.    Plaintiff and the other Class members relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of URI securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

75.    Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by the defendants, or been aware of the truth behind the Defendants' material misstatements and omissions, they would not have purchased URI securities at inflated prices.

76.    Plaintiff is also entitled to the *Affiliate Ute* presumption of reliance to the extent that Defendants failed to disclose material facts concerning the Cerberus Entities' demand to renegotiate the Merger Agreement, which information plaintiff would have wanted to have known and which would have caused investors to not have purchased shares of URI at the prices at which they traded during the Class Period.

## CLASS ACTION ALLEGATIONS

77.    Plaintiff brings this action on its own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities (the "Class") who purchased or acquired URI common stock during

the period from August 29, 2007 through and including November 14, 2007, inclusive ("the Class Period") and suffered damages as a result.

78.     Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of each of the Defendants; (iii) any person who was an executive officer and/or director of URI during the Class Period; (iv) any person, firm, trust, corporation, officer, director, or any other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants; (v) any person who profited from or actively participated in the wrongdoing at issue; (vi) the Cerberus Entities; and (vii) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

79.     The members of the Class, purchasers of URI securities, are so numerous that joinder of all members is impracticable.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, if not higher.  As of December 14, 2007, URI reported that it had 85.79 million shares of common stock issued and outstanding.

80.     Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and all members of the Class sustained damages as a result of the conduct complained of herein.

81.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained court-appointed counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the members of the Class that Plaintiff seeks to represent.

82.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

83.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether documents, including the Company's SEC filings, press releases and other public statements made by Defendants, during the Class Period contained misstatements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)   whether the Proxy Statement contained material misrepresentations or omitted to state material information;

(d)   whether the market price of URI stock during the Class Period was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

(e)   with respect to Plaintiffs' claims under Section 10(b) of the Exchange Act, whether Defendants acted with the requisite state of mind in omitting and/or

misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

(f)     with respect to Plaintiffs' claims pursuant to Section 20(a) of the Exchange Act, whether the Defendants named in those counts are controlling persons of the Company; and

(g)     whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the appropriate measure thereof.

84.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

85.     The names and addresses of the record owners of URI shares purchased during the Class Period, are obtainable from information in the possession of the Company's transfer agent(s).  Notice can be provided to such record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## INAPPLICABILITY OF SAFE HARBOR FOR FORWARD LOOKING STATEMENTS

86.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking when made, and there were no meaningful cautionary statements identifying facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.  To the extent that the statutory

safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading.  In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements which later became inaccurate.

## COUNT I

### Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 of the Securities and Exchange Commission

### (Against the URI Directors)

87.     Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

88.     This claim is asserted against the URI Directors on behalf of all Class members whose vote with respect to the adoption of the Merger Agreement was solicited pursuant to the Proxy Statement, in violation of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, and Rule 14a-9, 17 C.F.R. § 240.14a-9.

89.     This claim is based on nondisclosure and misstatements contained in the Proxy Statement.  This claim does not sound in fraud and should be read to exclude any reference to recklessness or fraud.  To the extent the circumstances of such nondisclosure are relevant or considered, this claim rests on allegations of negligence.

90.     The September 19, 2007 final Proxy Statement described herein was a "proxy solicitation" within the meaning of Section 14 of the Exchange Act, and Rule 14a-9 promulgated thereunder.

91.     Each of the Defendants named in this Count solicited proxies by causing the Proxy Statement, which was distributed to URI shareholders, to be issued, by permitting the use of their names in the Proxy Statement and by recommending in the Proxy Statement that URI shareholders approve the Merger Agreement.

92.     The Proxy Statement contained false statements of material facts and failed to disclose material facts necessary to make the statements made not false and misleading. The materially false and misleading statements include those set forth in ¶¶ 54-57, 59-61, above.

93.     The Merger required and received the affirmative vote of the URI shareholders at a special shareholders meeting held on October 19, 2007.

94.     As a result of the foregoing, Defendants named in this Count have violated Sectiojn 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated by the SEC thereunder.

95.     Lead Plaintiff and other members of the Class have sustained injury and damages by reason of defendants' misrepresentations in connection with the Proxy Statement.

## COUNT II

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission

#### (Against All Defendants)

96.     Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

97.     This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Lead Plaintiff and all other members of the Class, against all Defendants.

98.     Throughout the Class Period, Defendants individually, and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce, the mails and the facilities of a national securities exchange, employed devices, schemes and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, and engaged in acts, practices and a course of business which operated a fraud and deceit upon Class members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

99.     Defendants' false and misleading statements and omissions were made with scienter and were intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiff and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the Company's securities; and (iii) cause Lead Plaintiff and the other members of the Class to purchase URI's securities at inflated prices.

100.    Specifically, Defendants initiated or pursued a scheme and course of conduct which: (i) concealed the fact that Cerberus demanded and asserted a right to renegotiate the terms of the Merger Agreement; and (ii) deceived the investing public, including purchasers of URI securities during the Class Period, regarding the Cerberus Entities' intention to consummate the Merger Agreement as previously publicly disclosed, in an effort to maintain an artificially high price for URI securities in violation

of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants are sued as primary participants in the wrongful and illegal course of conduct charged herein.

101.    By failing to inform the market of the Cerberus Entities' efforts to renegotiate the Merger Agreement, and making other false statements and material omissions, these Defendants presented a misleading picture of URI's prospects. This caused and maintained artificial inflation in the trading prices of URI's publicly traded securities throughout the Class Period and until the truth came out.

102.    Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading and/or making direct statements to the investing public on the conference calls detailed herein.

103.    During the Class Period, Defendants occupied director and executive-level positions at URI and were privy to non-public information concerning the Company. Each of them knew or recklessly disregarded the adverse facts specified herein and omitted to disclose those facts. Specifically, the undisclosed facts relating to the Merger were all directly known by the Individual Defendants, who received or were copied on the key August 31 Letter and the September 6 Response, or played a central role in negotiating and effectuating the Merger.

104.    As described herein, Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and other members of the Class who purchased

31

URI securities during the Class Period.  Throughout the Class Period, Defendants had a duty to disclose new, material information that came to their attention, which rendered their prior statements to the market materially false and misleading.   There is a substantial likelihood that the disclosure of these omitted facts would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available about the prospects of the Merger Agreement being consummated.

105.    Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities.

106.    In ignorance of the false and misleading nature of the Defendants' statements and/or upon the integrity of the market price for URI securities, Plaintiff and the other members of the Class purchased URI securities at artificially inflated prices during the Class Period.  But for the fraud, they would not have purchased the securities at artificially inflated prices.

107.    The market price for URI securities declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Section 10(b) Defendants, as described above.

108.    Plaintiff and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of URI securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

109.    This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

110.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiff and the members of the Class, each of whom has been damaged as a result of such violation.

## COUNT III

### Violation of Section 20(a) of the Exchange Act

**(Against all Defendants Except URI)**

111.   Plaintiff repeats and realleges each and every allegation above as if set forth fully herein. This Claim is brought pursuant to Section 20(a) of the Exchange Act against the individual defendants on behalf of Plaintiff and all members of the Class who purchased URI securities during the Class Period.

112.   As alleged herein, URI is liable to Plaintiff and the members of the Class who purchased URI securities based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

113.   Throughout the Class Period, the Section 20(a) Defendants were controlling persons of URI within the meaning of Section 20(a) of the Exchange Act, and culpable participants in the URI fraud, as detailed herein.

114.   Each of the Section 20(a) Defendants exercised control over URI during the Class Period by virtue of, among other things, their executive positions with the Company, the key roles they played in the Company's management, and their direct involvement in its day to day operations, including its financial reporting and accounting functions.

115.   In addition to the allegations set forth above, the following allegations demonstrate the Section 20(a) Defendants' control over URI during the Class Period.

33

116.    Given their individual and collective responsibilities for managing URI throughout the Class Period, the Section 20(a) Defendants were regularly presented to the market as the individuals who were responsible for URI's day-to-day business and operations, as well as the Company's strategic direction.  These Section 20(a) Defendants accepted responsibility for presenting quarterly and annual results, setting guidance for future periods and assuring the market about the state of, and prospects for, the Merger Agreement.  No one else at URI exercised that degree of responsibility for, or control over, the Company's activities and public statements.

117.    As a result of the false and misleading statements and omissions alleged herein, the market price of URI securities was artificially inflated during the Class Period. Under such circumstances, the presumption of reliance available under the "fraud on the market" theory applies, as more particularly set forth above.  Plaintiff and the members of the Class relied upon either the integrity of the market or upon the statements and reports of the Section 20(a) Defendants in purchasing URI securities at artificially inflated prices.

118.    This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

119.    By virtue of the forgoing, each of the Section 20(a) Defendants are liable to Plaintiff and the Class, each of whom has been damaged as a result of URI's underlying violations.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.      Awarding Plaintiff and the members of the Class compensatory damages and/or rescission;

C.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.      Awarding such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Lead Plaintiff hereby demands a trial by jury in this action for all issues so triable.

Dated:  December 17, 2007

**THE PLAINTIFF**
**RAVEN ASSET MANAGEMENT, LLC**

**Attorney Elias A. Alexiades**
Federal Bar No. ct03543
P.O. Box 3859, Amity Station
New Haven CT 06525
203-777-4720
203-777-4722 fax
elia@alexiades.com

Gerald H. Silk
Blair A. Nicholas
Mark Lebovitch
David H. Webber
**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

**CERTIFICATION**

Alan Mark, Managing Partner and Chief Investment Officer of Raven Asset Management ("Raven") declares, as to the claims asserted under the federal securities laws, that:

1.    I am authorized to make this certification on behalf of Raven;

2.    I have reviewed a complaint filed in this matter;

3.    Raven did not purchase the securities that are the subject of this action at the direction of its counsel, Bernstein Litowitz Berger & Grossmann LLP, or to participate in this action.

4.    Raven is willing to serve as a lead plaintiff and class representative on behalf of the Class, including providing testimony at deposition and trial, if necessary. Raven fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act regarding its options as to selection and retention of counsel and overseeing the prosecution of the action for the Class.

5.    Raven's transactions in United Rentals, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

6.    Raven has sole discretion and authority to manage investments and bring litigation on behalf its clients.

7.    Raven has not served as a lead plaintiff in any securities class actions filed during the three years preceding the date of this Certification.

8.    Raven has not sought to serve as a lead plaintiff in any actions filed under the federal securities laws during the three years preceding the date of this Certification.

9.    Raven will not accept any payment for serving as a class representative on behalf of the class beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17th day of December 2007.

_____

**Alan Mark**
*Managing Partner and Chief Investment Officer*
*Raven Asset Management*

**Raven Asset Management**
**Transactions in United Rentals Inc. (URI**
Class Period: 08/29/07 – 11/14/07

| Transactions | Trade Date | Shares | Price |
|---|---|---|---|
| Purchase | 11-14-2007 | 30,000 | 28.8744 |